55 CCPA

**Application of Ernst F. G. KLESPER.**

**Patent Appeal No. 7932.**

United States Court of Customs and Patent Appeals.

June 27, 1968.

Donald M. Wight, Washington, D. C., for appellant.

Joseph Schimmel, Washington, D. C., (Jack E. Armore, Washington, D. C., of counsel), for Commissioner of Patents.

Before WORLEY, Chief Judge, and RICH, SMITH and ALMOND, Judges.

RICH, Judge.

This appeal is from the decision of the Patent Office Board of Appeals[1] affirming the examiner's rejection of all claims of application serial No. 336,038, filed January 6, 1964, entitled "Polyurethane Foams, Compositions and Methods."

The claims, 1–9, on appeal were presented for interference with Frost

patent No. 3,072,582 but the examiner refused to declare one, rejecting the claims as fully met by Frost and holding that appellant had not overcome the effective date of the Frost patent. Whether he has done so, which depends on what that date is, is the primary issue here and the only one we find it necessary to decide. The situation as to dates is as follows:

Appealed application filed January 6, 1964, as a continuation-in-part of application serial No. 610,658, filed *September 18, 1956*. Appellant has been accorded the latter date and his right to it is not disputed.

Frost Patent No. 3,072,582, issued January 8, 1963, on application serial No. 803,381, filed April 1, 1959, as a continuation-in-part of serial No. 541,823, filed *October 20, 1955*, now abandoned.

The Patent Office has held that the effective date of the Frost patent as a reference is the parent filing date, October 20, 1955, which is earlier than appellant's date. Appellant disputes this on two grounds: (1) Conceding that the Frost patent, if early enough, would anticipate the claimed inventions, appellant says that they were not disclosed in the Frost parent application in disclosure carried forward into the patent; (2) under the language of 35 U.S.C. § 102(e),

* * * the invention was described in a patent granted on an application for patent by another filed in the United States before the invention thereof by the applicant for patent, * * *.

Frost's patent did not issue *on* the parent application, but on serial No. 803,-381, wherefore the statute does not apply. The Patent Office has held that neither of these contentions is well taken, and the rejection was therefore proper. We agree.

---

1. Consisting of Asp and Behrens, Examiners-in-Chief, and Sterman, Acting Examiner-in-Chief, opinion by Sterman.

## The Invention

The invention relates to methods of making polyurethane foams and to the foams produced thereby. Claims 1–5 are drawn to method and claims 6–9 to foams in terms of product-by-process. It has been assumed throughout that the claims stand or fall together and therefore they need not be separately detailed by us. Claim 1 is illustrative:

1. The method of making a poly*ether* polyurethan foam which comprises mixing (1) an aromatic polyisocyanate, (2) a poly*ether* polyol, (3) water, and (4) a volatile inert organic *liquid* chlorofluoro alkane having a boiling point of *from 0° to 60°C.* in amount of from 10 to 35% based on the weight of the polyether polyol, the *alkane being volatilized by the exothermic heat of foaming.* [Our emphasis.].

The art of making polyurethane foams appears to have been known prior to the inventions of either Frost or appellant, which are improvements in an old process. Frost's patent and appellant's application provide comparable descriptions of prior art practices. For background, here is appellant's:

In present day prior art practice, a mixture of polyester, isocyanate (which is mostly di-isocyanate) and activator mixture (which consists generally of catalyst, water, emulsifier and sometimes several other additives) is prepared by any suitable mixing and metering assembly and discharged within seconds into any kind of mold or pan. After a short period of time, which is necessary for achieving a good distribution of the mixture in the pan, the actual foaming reaction starts. This reaction consists of first, the reaction between isocyanate and water, which results in the generation of $CO_2$ gas and expanding of the material; and second, of the reaction between isocyanate and polyester, which results in a linking reaction and hardening of the foam.

Appellant's specification, after discussing the making of poly*ester* polyurethane foams at considerable length, with eight specific examples, then proceeds to discuss and exemplify the making of poly*ether* polyurethane foams by substituting a poly*ether* polyol for the polyester polyols which he has described. It will be noted that claim 1, above, is specific to polyether polyurethanes. So are the other claims and this is a point to remember in connection with appellant's contention that Frost's abandoned application does not describe the claimed inventions.

Another point involved in the present dispute relates to the "inert organic liquid chlorofluoro alkane" of claim 1 and the limitation as to its boiling point falling between 0° and 60°C. The materials which fall within this description are used either as a sole or as an auxiliary blowing agent, producing gas *by vaporization* from the heat of reaction. Their use is an important aspect of the claimed inventions. The alkanes enable the production of soft foams of low density. Appellant describes his preferred materials as chlorofluoro alkanes and exemplifies them by reference to a number of materials known commercially as "Freons." He refers especially, and includes in most of his specific examples, "Freon 11," which is trichloromonofluoromethane ($CFCl_3$), which has a boiling point of 23.77°C. The one claim which is specific as to the alkane is claim 9 reading:

9. The polyether polyurethane of claim 6 in which the chlorofluoro alkane is $CFCl_3$.

The formula is that of "Freon 11." It can be written $CCl_3F$.

With this background, we are in a position to consider appellant's contentions. We shall consider first the contention that under section 102(e) the Frost patent must be restricted in filing date to the date of the last application on which it actually issued, for if that were a sound legal proposition there

would be no point in considering what the abandoned application discloses.

## The Effective Date Under
### 35 U.S.C. § 102(e)

Appellant's construction of section 102(e) must be rejected as contrary to long-settled law. Appellant has cited no authority for the proposition that, where there are successive applications and entitlement to an earlier filing date in the United States as contemplated by 35 U.S.C. § 120, the only filing date to be considered under section 102(e) is the last filing date, by virtue of the words "granted on an application." This is reminiscent of the too literal reading of statutes urged on us in In re Hilmer, 53 CCPA 1288, 359 F.2d 859 (1966), a case on which appellant relies. The literal reading there rejected was with respect to the words of 35 U.S.C. § 119, "shall have the same effect," as applied to giving effect to a United States patent as a reference as of its *foreign* filing date. We held that would be contrary to clear Congressional intent. Appellant now argues that we should do the same with respect to earlier United States filing dates, available to an applicant under section 120, and limit the date of a U. S. patent as a reference to the filing date of the last application on which it directly issued. This argument, insofar as it is based on our *Hilmer* decision, ignores the section of the opinion in that case entitled *"Section 120"* and much of the remainder of the opinion pointing out that domestic and foreign filing dates stand on entirely different footings.

Prior to the enactment of section 102(e) in 1952, there was a history of treating the disclosure of a U. S. patent as prior art as of the filing date of the earliest U. S. application to which the patent is entitled, provided the disclosure was contained in substance in the said earliest application. See, for example, McCrady, Patent Office Practice § 168, at 177 (2d ed. 1946). Section 102(e) was a codification of that law, as it was a codification of the rule of Alexander Milburn Co. v. Davis-Bournonville Co., 270 U.S. 390, 46 S.Ct. 324, 70 L.Ed. 651 (1926). The rationale of *Milburn* does not limit the rule to the filing date of the last filed of a series of copending cases containing common disclosure but is to the contrary.

We considered this question of law in a case decided and reported between the filing of appellant's main brief and the Patent Office main brief herein, In re Lund, 376 F.2d 982, 54 CCPA 1361. We there said:

It is, of course, incontrovertible that a discription of an invention of another in an application filed before an applicant's date of invention, upon which application a patent is issued, constitutes a bar to the issuance of a valid patent for the same invention, Alexander Milburn Co. v. Davis-Bournonville Co., 270 U.S. 390, 46 S.Ct. 324, 70 L.Ed. 651 (1926), codified by § 102(e), or obvious variations thereof, Hazeltine Research, Inc. v. Brenner, 382 U.S. 252, 86 S.Ct. 335, 15 L.Ed.2d 304 (1965). It is also well settled that where a patent purports on its face to be a "continuation-in-part" of a prior application, the continuation-in-part application is entitled to the filing date of the parent application as to all subject matter *carried over* into it from the parent application, whether for purposes of obtaining a patent or subsequently utilizing the *patent* disclosure as evidence to defeat another's right to a patent. 35 U.S.C. §§ 102(e), 120; Goodyear Tire & Rubber Co. v. Ladd, 121 U.S.App.D.C. 275, 349 F.2d 710, (1965), certiorari denied 382 U.S. 973, 86 S.Ct. 536, 15 L.Ed.2d 465; Asseff v. Marzall, 88 U.S.App.D.C. 358, 189 F.2d 660, (1951), certiorari denied 342 U.S. 828, 72 S.Ct. 51, 96 L.Ed. 626; In re Switzer, 166 F.2d 827, 35 CCPA 1013.

Quoting a portion of the above, the Patent Office brief states:

Since the Court in the *Lund* decision supra considered the issue "well

settled" upon the basis of a carry over of subject matter from the parent application to the patented application, no further discussion of appellant's contentions respecting the statutory provisions (Sections 102(e) and 120) or the *Hilmer* case or the other decisions relied upon (Board and Court) appears necessary. As shown above, appellant having conceded that the patent fully meets the appealed claims, the only question at issue is whether the parent *Frost* application discloses the claimed subject matter.

We are in agreement with that statement. We would only point out additionally that at oral argument opportunity was given appellant to file a memorandum on the *Lund* case since his brief was written and filed before its appearance. Appellant did so but took no exception therein to our statement of the *law* in the above quotation; instead, he argued only the question of what disclosure was carried forward and, in fact, now relies on *Lund* as "controlling authority." This would seem conclusively to dispose of appellant's attempt to rule out reliance on the date of Frost's abandoned application on the basis of section 102(e), amounting, as it does, to abandonment of the argument in his brief.

### Disclosure of Abandoned Parent Application

The question to be considered here is not whether the disclosure of the patent and the abandoned application are the same with respect to the inventions of the appealed claims but whether the subject matter of the appealed claims is disclosed both in the abandoned application and in the patent. Under section 102(e) it must, of course, be disclosed in the patent. Appellant admits that it is. For various reasons, he argues that it is not disclosed in the abandoned application.

We would observe, in passing, now that appellant treats *Lund* as controlling, that a quite different question was involved there. The disclosure relied on in the parent abandoned application appeared *only* in that application and did *not* appear in the patent. We said:

> It seems to us that the sine qua non of § 102(e) and the *Milburn* case is that, consistent with the gain to the public which the patent laws mean to secure, a *patent must issue* which contains, explicitly or implicitly, the description of an invention which is to be relied on to defeat a later inventor's patent rights.

Admittedly, that condition is met in the present case. In *Lund* we were not concerned with the dating back of a *patent* disclosure, we were considering whether a disclosure appearing *only* in an abandoned application was to be regarded as prior art under section 102(e). In *Lund,* reading the patent would give no clue to the existence of the disclosure in the application which was relied on. Here there is no question about the patent disclosure but only as to the date to be accorded it, as prior art, after it was made known by the issuance of the patent.

The examiner found all limitations of all appealed claims to be met by disclosure in the Frost abandoned application carried forward into the patent, giving detailed citations for each limitation. The board agreed with the examiner's findings. We have studied with care the appellant's argument as to why there is not a disclosure of the claimed subject matter and find it lacking in substance. Speaking generally, what appellant does is to attempt to minimize the disclosure that is there by characterizing it as "vague," "conjecture," and consisting of "general" or "bare, unsupported statements." He complains repeatedly that the disclosure is not amplified by the inclusion of specific examples teaching "how to produce a polyurethane foam" according to the claims. This kind of invective cannot get rid of the disclosure that is there or get us to ignore it.

### Polyether Disclosure

More specifically, appellant complains that Frost's abandoned application "con-

tains only the vaguest and most general references to polyethers of any type * * *. There is no example or adequate teaching of making a polyurethane foam using a polyether component." This is answerable by simply reciting the facts. Frost's specification opens with the sentence, "This invention relates to the making of polyester-and/or polyether-diisocyanate foams." The second paragraph discusses the *prior art* practice in making "polyether- or polyester-diisocyanate foams." It then discusses the invention generally with particular reference to making foams using polyesters and gives three fully detailed examples thereof covering about five printed pages. It then says:

All or part of the polyesters used in the examples may be substituted by polyethers. Suitable polyethers for use in obtaining improved polyurethane foams are polyalkylene ether glycols such as the mixed polyglycol of ethylene-propylene, polyethylene glycol, the latter of which is sold under the name of "Carbowax 1000" and has a molecular weight of about 1000.

Polyethers are preferred which have a molecular weight above 700 but those with a molecular weight as low as 500 to 600 or as high as 3500 or even somewhat higher may be used, depending upon the type of improved foamed product desired. Other suitable polyethers besides the aforementioned mixed polyalkylene either glycols such as poly (ethylene-propylene) ether glycols are polytetramethylene ether glycol, polytrimethylene ether glycol, polyneopentylene ether glycol, and polypentamethyl ether glycol and mixtures of these.

Appellant's characterization of this as vague and general strikes us as wishful thinking. We agree with the Patent Office position that to one skilled in the art the above disclosure with respect to polyethers is tantamount to setting forth specific examples, especially since it appears that it was already known to the art to use polyethers to make polyurethane foams. While it may be a *limitation* of appellant's claims, the use of polyethers cannot be said to be his *contribution* to the art.

### Alkane Boiling Point Disclosure

The other argument principally emphasized by appellant relates to the use of "liquid chlorofluoro alkane having a boiling point of from 0° to 60°C." Now, that is obviously an inclusive *range* of boiling points reading on any such material whose boiling point falls within the range. The term "liquid" is, moreover, relative since a blowing agent alkane with a boiling point of 1°C., which is within the stated range, is not going to *be* liquid unless appropriate conditions such as ambient temperature and pressure and whether it is dissolved in another component are such as to maintain it in a liquid state. Frost, like appellant, discloses that the alkane acts as a blowing agent by vaporization from reaction heat and states, inter alia, "a liquified gas that is soluble in the polyester is preferred." As pointed out in describing appellant's invention above, appellant's preferred blowing agent is "Freon 11" whose boiling point of about 23°C. falls in the claimed range. The Frost abandoned application likewise discloses the same "Freon 11," as "$CCl_3F$." Frost also discloses other "halogen substituted alkane gases" some with boiling points within the claimed range and some lower than 0°C. The Patent Office considered the disclosure of materials within the claim limitation to be sufficient, notwithstanding the disclosure of others which are not. So do we. The solicitor's brief points out that in addition to "Freon 11," Frost's abandoned application and patent disclose "Freon 21" (b.p. 48°F. or 8.8°C.), and "Freon 114" (b.p. 38°F. or 3.3°C.)

Appellant took advantage of our invitation to discuss the *Lund* case by filing a supplemental memorandum in which he attempts to show that three other

claim limitations are not disclosed in Frost's abandoned application, namely, the inclusion of *water* in the reaction mixture (a limitation not in all appealed claims), the production of foam having a *density* of about 1.2 to 2.5 lbs. per cu. ft. (claims 7 and 8), and foam of soft texture (claim 8). Frost's abandoned application contains numerous disclosures of the use of a small amount of water, including each of the specific examples using polyester, for which he says polyether can be substituted. It discloses production of a foam having a density of 2.5 lbs./cu. ft. One of Frost's stated objects is "to provide a means for making a softer cellular polyurethane * * *." Another stated object is "cellular polyurethanes of low density which are softer and more resilient and which have less shrinkage at low density than those heretofore produced."

## Conclusions

■■ We agree with the conclusion of the Patent Office that Frost's abandoned application discloses the subject matter of the appealed claims and it is admitted that that subject matter is contained in the reference patent. It follows that it was carried forward and that the effective date of the patent as a prior art reference against the appealed claims under section 102(e) is October 20, 1955, which antedates appellant. The decision of the board affirming the rejection on Frost is therefore affirmed.

In view of the affirmance of the rejection on Frost, we find it unnecessary to consider the other rejection "as unpatentable over claim 59 of applicant's parent application S.N. 610,658."

Affirmed.

SMITH, J., concurs in the result.