The **UNIVERSITY OF WEST VIRGINIA BOARD OF TRUSTEES, Plaintiff,**

v.

**Kurt L. VanVOORHIES, Defendant,**

v.

**West Virginia University Research Corporation, et al.**

**No. CIV. A. 1:97–CV–144.**

United States District Court, N.D. West Virginia, Martinsburg Division.

Feb. 17, 2000.

Andrew G. Fusco, The Fusco Legal Group, Morgantown, WV, David E. Tungate, Kirk D. Houser, Eckert, Seamans, Cherin & Mellott, Pittsburgh, PA, Arnold P. Silverman, Eckert, Seamans, Cherin & Mellott, LLC, Pittsburgh, PA, for Plaintiff.

William A. Kolibash, Phillips, Gardill, Kaiser & Altmeyer, Wheeling, WV, Kenneth A. Martin, Kurt M. Rylander, Martin & Rylander, P.C., Washington, DC, for Defendant Kurt Vanhoorhies.

Gordon H. Copland, Steptoe & Johnson, Clarksburg, WV, Megan D. Dortenzo, Steptoe & Johnson, Clarksburg, WV, Rhonda L. Miller, MacCorkle, Lavender & Casey, PLLC, Morgantown, WV, for Third-Party Defendants.

Braun A. Hamstead, Hamstead & Associates, LC, Charles Town, WV, William A. Birdwell, Birdwell & Janke, LLP, Portland, OR, for Interested Party IAS Communications.

## MEMORANDUM OPINION AND ORDER

BROADWATER, District Judge.

On October 8, 1999, came the parties, by counsel, for a combined hearing on the parties' motions for summary judgment.[1] These motions were filed by the plaintiff, the University of West Virginia Board of Trustees (WVU) and the third-party defendant, West Virginia University Research Corporation (WVURC),[2] the defendant and third-party plaintiff, Kurt L. VanVoorhies (VanVoorhies),[3] and the third party defendants, Dr. James E. Smith (Smith)[4] and Integral Concepts, Inc. (ICI).[5] After the summary judgment hearing,[6] Magistrate Judge Seibert issued an Order[7] denying VanVoorhies' motion to compel the deposition of Smith.[8] VanVoorhies objected to the Magistrate Judge's Order.[9] The Court modified this Order[10] by conducting an in court deposition of Smith on November 18, 1999.[11]

Thereafter, the Court issued an Order[12] granting partial summary judgment in favor of the plaintiff and third-party defendants as to claims seven, eight, nine and thirteen of the Amended Counterclaim[13]

and Third–Party Complaint.[14] As well, counsel for WVU also subsequently filed a motion to dismiss pursuant to FED. R. CIV. P. 12(h)(3).[15] The Court held a telephonic status conference addressing, *inter alia*, this motion,[16] on January 5, 1999.[17]

After considering the parties' briefs, hearing the arguments of counsel, and reviewing the record herein, this Court is of the opinion, for the reasons set forth below, that summary judgment should be granted as follows:

1. In favor of WVU, WVURC, Smith, and ICI as to the First Claim, Fifteenth Claim, and Fourteenth Claim of the Amended Counterclaim[18] and Third–Party Complaint.[19]

2. In favor of WVU as to Counts I and IV of the Complaint.[20]

The Court's ruling is based on the following undisputed material facts as determined after the Court's thorough review of an extensive documentary record.

## I. STATEMENT OF MATERIAL FACTS.

VanVoorhies and Smith are identified as co-inventors in United States Patent No. 5,442,369 (Patent '369). Patent '369 covers a contrawound toroidal antenna.[21] Van-Voorhies worked on the technology in Pat-

1. Doc. # 187.

2. Doc. # 130.

3. Doc. # 134.

4. Doc. # 136.

5. Doc. # 133.

6. Doc. # 187.

7. Doc. # 194.

8. Doc. # 178.

9. Doc. # 198.

10. Doc. # 194.

11. Doc. # 202.

12. Doc. # 248.

13. Doc. # 34.

14. Doc. # 32.

15. Doc. # 288.

16. *Id.*

17. Doc. # 293.

18. Doc. # 34.

19. Doc. # 32.

20. Doc. # 1.

21. Invention diagrams reveal that this antenna appears to be in the shape of a doughnut. Doc. # 154, Exh. 3.

ent '369 while he was a Graduate Research Assistant at WVU.

VanVoorhies became acquainted with Smith during VanVoorhies' first visit to WVU in 1987, as a Society of Automotive Engineers lecturer. At that time, VanVoorhies was employed by General Motors as a Senior Design Engineer. During a tour of WVU's facilities, VanVoorhies viewed the projects with which Smith was involved.

Maintaining contact with Smith over the subsequent years, VanVoorhies decided to enroll in graduate school at WVU in 1990 to pursue a Ph.D. in engineering. VanVoorhies left a well paying job as a Director of Safety Systems for Automotive Systems Laboratory, Inc. At this laboratory, VanVoorhies managed a multi-million dollar project for automotive airbag inflator development.

In an unsolicited letter to the Chairman of the WVU Mechanical and Aerospace Engineering Department, dated February 6, 1992, VanVoorhies stated the following:

I left that job [as a Director of Safety Systems of Automotive Systems Laboratories, Inc.,] to pursue a Ph.D. in engineering, after having applied to only one school—WVU—because of the opportunity to work ·with one professor—Dr. James E. Smith. I am glad to have made that decision and feel fortunate to have Dr. Smith as my graduate advisor and committee chairman. I have subsequently worked for Dr. Smith since August 1990 as a Graduate Research Assistant.[22]

From August 1990 through December 1993, WVU paid VanVoorhies a $1,200 per month stipend for his services as a Graduate Research Assistant and for his work on a Ph.D. dissertation topic. Smith, as VanVoorhies' research advisor, supervised VanVoorhies as both a Graduate Research Assistant and a Ph.D. candidate.[23]

In August 1990, Smith assigned VanVoorhies the task of reviewing prior art work related to wireless power transmission. This included a specific low frequency Ground Wave Emergency Network system antenna project (GWEN project) related to wireless power. The GWEN project included an investigation of a prior art antenna. This prior art antenna was the Corum Element antenna. Professor James F. Corum obtained U.S. Patent Nos. 4,622,558 and 4,751,515 for his torodial helical antennas developed while working in WVU's Electrical Engineering Department. The prior investigation of the Corum Element antenna could not prove that such antenna was a viable or functional candidate for the GWEN project. Smith was interested in ascertaining why the prior art antenna was not functional.

Smith met with VanVoorhies frequently regarding the problems with the prior art antenna. Smith maintains that he instructed VanVoorhies to work on specific changes to the antenna.[24] Smith also provided other technical suggestions to VanVoorhies.

VanVoorhies completed his original contrawound toroidal helical antenna invention by June 3, 1991. VanVoorhies reviewed the project with Smith. Thereafter, Smith signed VanVoorhies' log book.

VanVoorhies was aware of invention releases in reference to his employment experiences prior to enrolling in WVU's Ph.D. program. Consequently, at that time, VanVoorhies asked Smith about VanVoorhies' own invention rights to his contrawound torodial helical antenna. In response, Smith informed VanVoorhies about

---

22. Doc. # 132, Exh. 2.

23. Ph.D. students, who pursue a degree with financial support and who are employed at WVU, usually work in areas related to their Ph.D. dissertation topic, unrelated research areas, or by accepting various assignments, such as teaching classes and grading papers.

In his role as research advisor, Smith assigned students to work in areas that would potentially lead to a Ph.D. dissertation topic.

24. These changes focused on the windings and the number of signal feed ports associated with the prior art antenna.

WVU's Patent Policy. VanVoorhies subsequently acknowledged that he was advised that WVU's Patent Policy gave inventors a thirty percent (30%) royalty.

The WVU Patent Policy has been in effect since 1985. This policy applied to "all full-time and part-time members of the faculty and staff, and all other employees of the University including graduate and undergraduate students and fellows of the University." [25] The Patent Policy provided for committing support for research and invention at WVU and a structure for compensation and incentives to inventors at WVU.[26] The Patent Policy required the inventor to cooperate fully with the University in all respects for the purpose of preparing, filing, and prosecuting patent applications and maintaining resultant patents.[27]

In VanVoorhies' letter to WVU's patent lawyers, dated May 27, 1994, VanVoorhies stated that he elected to pursue the invention within WVU for several reasons. VanVoorhies recognized the need to test the invention at WVU, and "the possibility (probability)" for litigation concerning the prior art Corum antenna and his antenna.[28] Furthermore, VanVoorhies was concerned with the economies of obtaining a patent and his interest in graduating from WVU as soon as possible.[29]

In November 1991, VanVoorhies completed the Disclosure of Invention form associated with WVU's Patent Policy. VanVoorhies submitted the form to Smith, listing Smith as a co-inventor. Smith signed the form on November 8, 1991. VanVoorhies signed the form on November 12, 1991.[30] There are no contemporaneously written documents that show any objection by VanVoorhies to listing Smith as a co-inventor.

Thereafter, WVU first sent the Disclosure of Invention to Research Corporation Technologies (Research Corp.), an Arizona Corporation. Research Corp. reviewed the Disclosure of Invention for commercial application. However, on May 4, 1992, Research Corp. rejected the opportunity for a license of the technology.

In June 1992, Smith incorporated Integral Concepts, Inc. (ICI) for the purposes of establishing a consulting business. ICI is a company wholly owned by Smith. The plan to incorporate ICI started several months earlier. However, the incorporation of ICI was delayed due to the uncompleted paperwork by Smith's attorney.

VanVoorhies next prepared a research proposal to Rome Laboratory at Griffiss Air Force Base. However, like Research Corp., Rome Laboratory declined this offer.

During this period, VanVoorhies, along with Smith and two other inventors, submitted an additional Disclosure of Invention.[31] This Disclosure of Invention, dated March 24, 1992, covered a "Quarter-wave coaxial cavity resonator as an ignition source." [32] This invention was subsequent-

---

25. Doc. # 1, Exh. B.

26. West Virginia University is committed to supporting faculty members and staff in all matters related to patents based on discoveries and inventions developed in situations when the invention has been created solely or jointly by them. The objectives of this Policy are to encourage and aid research at the University, to provide financial compensation and professional recognition to inventors, and to protect and serve the public interest. *Id.*

27. *Id.* ("The inventor shall cooperate fully with the University in all respects; to the evaluation of an invention, the preparation of the filing and prosecution of an application and the transfer of rights in the same as well as the maintenance and protection of any resultant patents.").

28. Doc. # 154A, Exh. 6.

29. *Id.* ("Considering . . . the economies of obtaining a patent, and my interest in graduating from WVU as soon as possible, I elected to pursue this matter within the University system.").

30. Doc. # 132, Exh. 3.

31. *Id.*, Exh. 8.

32. *Id.*

ly disclosed and claimed in U.S. Patent Application Serial No. 08/164,600 (Application '600) and later issued as Patent No. 5,361,737. VanVoorhies, along with the two other inventors, assigned this invention to WVU.[33] VanVoorhies did not object to the co-inventorship of this patent nor the assignment of this patent to WVU.

In November 1992, VanVoorhies and Smith reviewed the draft antenna patent claim. After several revisions, VanVoorhies and Smith signed the patent application as co-inventors. On December 15, 1992, Patent Application No. 07/992,970 (Application '970) was filed with the U.S. Patent and Trademark Office (Patent Office). Application '970 was subsequently issued as Patent '369 on August 15, 1995.

On February 5, 1993, VanVoorhies and Smith, by a written assignment, assigned all rights in the original antenna to WVU.[34] The assignment contained no restrictions regarding WVU's subsequent licensing rights. This assignment included the invention disclosed in Application '970, and also any divisional, continuation, continuation-in-part, or substitute application filed upon the invention in the United States or any other country.[35]

Although VanVoorhies acknowledged receiving a copy of the Patent Policy, VanVoorhies stated he does not recall the specific date when he received a copy of the

Patent Policy. In a subsequent filing with the Patent Office, VanVoorhies stated that he executed this assignment with the understanding that, in exchange for the assignment, he would enjoy the benefits of the WVU Patent Policy.[36]

There is no evidence that, at the time of the assignment, there was any agreement or plan that WVU or WVURC would select Smith, or any company, in which Smith had an interest, to be the commercial developer of the antenna.

In the summer of 1993, VanVoorhies enrolled in a Patent Bar Review Course offered by the Patent Resources Institute. In his May 27, 1994 letter, VanVoorhies stated that the Patent Bar Review Course concerned the subject of inventorship and that he learned

1) invention comprises conception in a form which can be readily reduced to practice by one skilled in the art without undo experimentation, 2) a patent can be held invalid without proper inventorship, 3) errors in inventorship must me (sic) corrected diligently, and 4) under 37 C.F.R. § 1.56, all parties to the invention ... have the duty to disclose to the Patent Office any information that is material to patentability.[37]

In that same letter, VanVoorhies stated that, after conversing with Smith during

---

33. *Id.*, Exh. 9.

34. Doc. # 1, Exh. C.

35. The undersigned does (do) hereby sell, assign, transfer and set over until said assignee, its successors and assigns, the entire right, title and interest in and to said invention or inventions, as described in the aforesaid application, in any form, embodiment thereof, and in and to the aforesaid application; and in and to any application filed in any foreign country based thereon, including the right to file said foreign applications under the provisions of the International Convention; also the entire right, title and interest in and to any and all patents or reissues or extensions thereof to be obtained in this or any foreign country upon said invention or inventions and any divisional, continuation, continuation-in-part or substitute applications which may be filed

upon said invention or inventions in this or any foreign country; and the undersigned hereby authorize(s) and request(s) the issuing authority to issue any and all patents on said application or applications to said assignee or its successors and assigns.
*Id.*

36. Doc. # 154A, Exh. 7 (stating that VanVoorhies executed the assignment to WVU "with the understanding that in exchange he would enjoy the benefits of the West Virginia University Patent Policy pertaining to this specific invention.").

Smith also represented that he informed VanVoorhies of the patent policy "within six (6) months of Dr. VanVoorhies becoming a graduate student at WVU." Doc. # 132, Exh. 10.

37. Doc. # 154A, Exh. 10.

the week of August 30, 1993, VanVoorhies reviewed each claim of the application for invention to see if he could recall any definite conceptual contributions to the claim by Smith. In a February 23, 1995 letter, VanVoorhies stated that after his review of conceptual contribution to the claim by Smith, VanVoorhies could not find a single claim for which VanVoorhies was not the exclusive inventor.[38] VanVoorhies claims that he then told Smith he was concerned about the validity of the patent if the inventorship was not proper.[39]

On December 29, 1993, VanVoorhies completed his dissertation and received his doctorate from WVU. This ended his position as a Graduate Research Assistant to Smith. On February 1, 1994, WVU hired VanVoorhies as a Post–Graduate Research Assistant Professor. VanVoorhies worked at WVU in this position until May 10, 1994.

After initially failing to commercially develop the invention, WVURC, by written agreement, exclusively licensed the antenna technology to ICI, on April 12, 1994.[40] The WVURC–ICI agreement provided for ICI's payment of an annual minimum $3,000.00 royalty to WVURC, as well as an earned royalty on sales, leases, and sublicenses of the technology,[41] in a sum equal to ten percent (10%) of the net revenues.[42] The WVURC–ICI agreement also contained a confidentiality clause requiring non-disclosure of trade secrets and technology covered by the agreement.[43]

While working at WVU as a Post–Graduate Research Assistant Professor, VanVoorhies appeared to invent an improvement to the technology embodied in Application '970.[44] In a letter dated October 6, 1994, VanVoorhies suggested that the disclosure of this second invention could serve as a basis for a continuation-in-part (CIP) to Application '970.[45] VanVoorhies then prepared a preliminary invention disclosure (Half–Wave Bifilar Contrawound Toroidal Helical Antenna) in

38. Doc. # 132, Exh. 5 ("After I made another careful review of the claims, and could not find a single claim for which I did not know for a fact that I was the exclusive inventor, [Smith] told me that he would go 'downtown' and have his name taken off the patent.").

39. Id. ("I was concerned that [Smith's] inclusion as an inventor could jeopardize the validity of the patent.").

40. Doc. # 158, Exh. C.

41. ICI shall pay WVURC as a minimum annual royalty on December 31, 1994, and each December 31 thereafter, during the term of this Agreement, or any renewals thereof, the sum of Three Thousand Dollars ($3,000). In any year which the earned royalties exceed the minimum royalty, no additional payment of the minimum royalty shall be required. Id.

42. Id. ("ICI shall pay to WVURC as an earned royalty on sales, leases, or sublicenses by ICI as to 'The Technology' a sum equal to 10% of the 'Net Revenues' as above defined.").

43. The trade secrets and technology embodied in The Technology, or the existing or future products of hardware manufacturers, any methods or protection employed by to prevent unauthorized duplication of software programs, the terms of this Agreement, and any other confidential business or technical information disclosed by WVURC to ICI or by ICI to WVURC shall be held in strict confidence and shall not be disseminated by WVURC or ICI, except by ICI to a buyer, lessee or sublicensor, when such disclosure is protected by a written confidentiality agreement between ICI and customer, imposing obligations on customer no less than those imposed by this Section V on ICI. Id.

44. Doc. # 132, Exh. 3.

45. Id. ("This disclosure could serve as the basis of a CIP to the present application.").

A continuation-in-part application is defined by the Manual of Patent Examining Procedure as "an application filed during the lifetime of an earlier nonprovisional application by the same applicant, repeating some substantial portion or all of the earlier nonprovisional application and adding matter not disclosed in the said earlier nonprovisional application." MANUAL OF PATENT EXAMINING PROCEDURE § 201.08; see also In re Wertheim, 646 F.2d 527, 536 (C.C.P.A.1981) ("A continuation-in-part application, by definition, adds new matter to the parent application previously filed.").

December, 1994.[46] VanVoorhies forwarded this preliminary invention disclosure to the WVU's legal counsel. In his letter, dated January 9, 1995, VanVoorhies stated that "[i]t is in the University's best interest that you be well informed about the invention so you can obtain the broadest and strongest protection possible for the invention."[47]

WVU ultimately disclosed and filed this improved embodiment in U.S. Patent Application No. 08/486,340 (Application '340), entitled "Toroidal Antenna." As VanVoorhies recognized in his draft letter of early 1995, "intellectual property associated with this antenna will belong to WVU based upon the fact that I invented the antenna in my capacity as a graduate student at WVU."[48]

On July 10, 1995, ICI, by written agreement, sublicensed the antenna technology to IAS Communications, Inc. (IAS). Under the ICI–IAS agreement, IAS paid ICI $250,000 and transferred 3,000,000 shares of IAS stock to Smith. IAS further assumed the obligation to pay the minimum annual royalties and the earned royalties to WVU. IAS also assumed the obligation to fund commercial development of the antenna technology. Both the WVURC–

ICI agreement and the ICI–IAS agreement did not effect WVU's obligation to VanVoorhies or Smith under the Patent Policy.[49]

WVU then corresponded with VanVoorhies and his then legal counsel, Lyman Lyon, from February, 1995 forward. The purpose of these correspondences was to convince VanVoorhies to assist in the preparation and filing of Application '340. On February 15, 1995, VanVoorhies was provided with a confirmatory assignment document. This document expressly conditioned the assignment of the invention, described in Application '340, upon VanVoorhies' continuing right to receive benefits under the Patent Policy. On May 31, 1995, WVU provided Attorney Lyon with the patent application, unfiled as of that date. This patent application would ultimately become Application '340. Assignments were again provided with this application.

When no response was received, WVU filed Application '340 on June 7, 1995. Application '340 named VanVoorhies as the sole inventor, under 37 C.F.R. § 1.47(b).[50] This regulation, subject to the Patent Office's approval of the evidence presented, permits the rightful owner of an invention

46. Doc. # 132, Exh. 14.

47. Id.

48. Id., Exh. 15.

49. On July 10, 1995, [IAS] and Integral Concepts, Inc., hereinafter called ICI, entered into an exclusive sublicense agreement that gives the Company the same terms and conditions of the license agreement between West Virginia University Research Center, hereinafter called WVURC, and ICI as follows:
    1. The Company will pay a minimum annual royalty starting December 31, 1995 of $3,000.00.
    2. The Company will pay WVURC 10% of net revenue on earned royalties, leases or sublicenses.
    3. The Company will pay ICI a 3% royalty on all gross sales.
    Doc. # 158, Exh. E.

50. Whenever all of the inventors refuse to execute an application for patent, or cannot be found or reached after diligent effort, a person to whom an inventor has assigned or agreed in writing to assign the invention or who otherwise shows sufficient proprietary interest in the matter justifying such action may make application for patent on behalf of and as agent for all the inventors. The oath or declaration in such an application must be accompanied by a petition including proof of the pertinent facts, a showing that such action is necessary to preserve the rights of the parties or to prevent irreparable damage, the fee set forth in § 1.17(i), and the last known address of all of the inventors. The Office shall, except in a continued prosecution application under § 1.53(d), forward notice of the filing of the application to all of the inventors at the addresses stated in the application and publish notice of the filing of the application in the Official Gazette. An inventor may subsequently join in the application on filing an oath or declaration complying with § 1.63.
37 C.F.R. § 1.47(b) (1999).

to file a patent application when an inventor refuses to execute a patent application. Application '340 was filed as a CIP of Application '970.[51]

On October 31, 1995, the Patent Office held that, based upon VanVoorhies' assignment of Application '970, WVU was justified in filing Application '340.[52]

On August 15, 1995, the Patent Office issued the '369 Patent from Application '970. Patent '369 identified VanVoorhies and Smith as co-inventors. As a result of the assignment executed by both Smith and VanVoorhies, WVU claims to be the owner of Patent '369.

However, on the day before the Patent Office issued Patent '369, on August 14, 1995, VanVoorhies filed U.S. Patent Application No. 08/514,610 (Application '610) for the purpose of provoking an interference with Application '970. On that same day, VanVoorhies filed U.S. Patent Application No. 08/514,609 (Application '609). VanVoorhies assigned any interest he claims in Application '609 (and U.S. Letters Patent No. 5,734,353 (Patent '353) which was issued on March 31, 1998 from Application '609) and Application '610 to VorteKx, P.C. on October 24, 1997. VanVoorhies is the president and majority shareholder of VorteKx.[53] Application '609 is directed toward the invention disclosed and claimed in Application '340.

WVU filed this lawsuit on August 14, 1997.[54] After the Court denied defendant's motion to dismiss,[55] VanVoorhies' legal counsel filed a combined Answer and Counterclaim with 104 paragraphs on May 22, 1998.[56]

Counsel for VanVoorhies then filed an Amended Counterclaim[57] and Third–Party Complaint[58] with 234 paragraphs that listed fifteen separate causes of action. As a result of the Court's Order on the motions to dismiss[59] and summary judgment,[60] there currently remains for consideration by the Court the following claims:

A. Defendant's First Claim: Fraud, Fraudulent Concealment, and Misrepresentation.

B. Defendant's Fifteenth Claim: Declaration of Invalidity of Assignment Under the Patent Act.

C. Defendant's Fourteenth Claim: Declaration of Patent Invalidity Under the Patent Act.

D. Plaintiff's Counts I and IV: Breach of Duty Under Contract and Common Law, to Assign to the University, Inventions and Related Patent Property.

## II. SUMMARY JUDGMENT STANDARD.

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."[61] This requires the Court to conduct "the threshold inquiry of determining whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party."[62]

51. *See id.*

52. Doc. # 132, Exh. 16.

53. Doc. # 199.

54. Doc. # 1.

55. Doc. # 25.

56. Docs. # # 28, 29

57. Doc. # 34.

58. Doc. # 32.

59. Docs. # # 75, 76.

60. Doc. # 248.

61. Fed.R.Civ.P. 56(c); *see Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

62. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

The party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts."[63] "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted."[64]

## III. DISCUSSION OF LAW.

### A. Defendant's First Claim: Fraud, Fraudulent Concealment, Misrepresentation.

The First Claim of the defendant's Amended Counterclaim[65] and Third–Party Complaint[66] relate to common law claims of fraud, fraudulent concealment and misrepresentation. VanVoorhies' allegations of fraud are set forth as follows. First, VanVoorhies claims that WVU, by its agent, Smith, required VanVoorhies to designate Smith as a joint inventor of Application '970. For this reason, VanVoorhies claims that he was induced to assign the invention to WVU.

Second, VanVoorhies alleges that WVU and Smith had a prior secret agreement to license the invention to Smith and ICI.

Accordingly, VanVoorhies states that as a result of duress, he executed the patent assignment to WVU in 1993. VanVoorhies also claims that WVU, by its agent Smith, made misrepresentations and fraudulent nondisclosures to VanVoorhies to induce VanVoorhies to assign Application '970, with an implied threat to VanVoorhies' academic standing, and hid other material information which should have been disclosed to VanVoorhies.

Because this Court is sitting in diversity, this Court must apply West Virginia substantive law and West Virginia's statute of limitations.[67] Therefore, the Court will address the common law claims of fraud, and its applicable statute of limitations, in the context of West Virginia Law.

### 1. Statute of Limitations.

■ VanVoorhies' fraud claims are all subject to a two-year statute of limitations.[68] The discovery rule tolls the statute of limitations.[69] Under the discovery rule, the two-year statute of limitations for fraud claims commences when a person discovers or could have, with reasonable diligence, discovered the fraud.[70] The discovery rule applies when a person is prevented from discovering his claim.[71]

---

63. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

64. *Anderson*, 477 U.S. at 249, 106 S.Ct. 2505 (citations omitted).

65. Doc. # 34.

66. Doc. # 33.

67. *See Erie Railroad Co. v. Tompkins*, 304 U.S. 64, 78, 58 S.Ct. 817, 82 L.Ed. 1188 (1938); *see also Guaranty Trust Co. v. York*, 326 U.S. 99, 110, 65 S.Ct. 1464, 89 L.Ed. 2079 (1945) (stating that a federal court in diversity must apply the state statute of limitations).

68. W. VA.CODE § 55–2–12 (1994) ("Every personal action for which no limitation is otherwise prescribed shall be brought ... within two years next after the right to bring the same shall have accrued if it be for damages for personal injuries"); *Beall Plumbing & Heating Co. v. First Nat'l Bank*, 847 F.Supp. 1307, 1310 (S.D.W.Va.1994) ("The plaintiff's claims [of fraud] are clearly governed by the two-year statute of limitations provided for under West Virginia Code Section 55–2–12."); *Brown v. Community Moving & Storage, Inc.*,

193 W.Va. 176, 455 S.E.2d 545, 547 n. 3 (1995) (stating that the two year statute of limitations applies to fraud actions).

69. *Cart v. Marcum*, 188 W.Va. 241, 423 S.E.2d 644, 646 (1992) ("Under the 'discovery rule,' the statute of limitations is tolled").

70. *Id.* at 647 (stating that the discovery rule mitigates the harshness of the statute of limitations by tolling the statute of limitations "until the plaintiff knows or by reasonable diligence should know that he has been injured."); *Stemple v. Dobson*, 184 W.Va. 317, 400 S.E.2d 561, 565 (1990) ("Accordingly, we conclude that where a cause of action is based on tort or on a claim of fraud, the statute of limitations does not begin to run until the injured person knows, or by the exercise of reasonable diligence should know, of the nature of his injury").

71. *Cart*, 423 S.E.2d at 648 ("The 'discovery rule,' then is to be applied with great circumspection on a case-by-case basis only where there is a strong showing by the plaintiff that he was *prevented* from knowing of the claim at the time of the injury.").

■ VanVoorhies' fraud claims are untimely. VanVoorhies alleged damages flow from two areas. The first is VanVoorhies' consent to listing Smith as a co-inventor of the original antenna. This occurred on November 12, 1991.[72] The second is VanVoorhies' assignment of the invention to Smith and WVU on February 5, 1993.[73] Therefore, any alleged statements or actions made by Smith, to either induce first, the co-inventor listing, or second, the assignment of the patent, took place prior to February 5, 1993 or, at latest, on February 5, 1993.

WVU instituted this action on August 14, 1997,[74] a period more than two years after February 5, 1993. In addition, VanVoorhies knew every fact, in support of any claim for fraud, by December 1993, when he received his Ph.D. VanVoorhies was also armed with detailed knowledge of patent law that he had received in the Patent Bar Review Course in the summer of 1993. Therefore, assuming, for statute of limitations purposes, that VanVoorhies' claims pled in this case relate back to the filing of WVU's lawsuit on August 14, 1997,[75] the Court concludes that VanVoorhies fraud claims are untimely.

Further, the Court also concludes that the discovery rule and the tolling of the statute of limitations do not apply. VanVoorhies alleges that Smith represented to him in June 1991 that he, VanVoorhies, would have an influence as to the selection of a license of the patent. However, VanVoorhies admits that he became aware of the Patent Policy upon his invention of the antenna in June 1991. At any time after June 1991, VanVoorhies could have examined the Patent Policy and learned that the Patent Policy did not guarantee him any right to be consulted regarding licensing decisions.[76] However, VanVoorhies did not do so. Further, VanVoorhies subsequently acknowledged that he expected to receive the benefits of WVU's Patent Policy when he assigned the patent to WVU on February 3, 1993.[77] This indicates that VanVoorhies became familiar with the Patent Policy. Accordingly, any alleged reliance by VanVoorhies that he would be permitted an influence, as to the selection of a license of the patent, was not reasonable and cannot toll the statute of limitations.

VanVoorhies was not prevented from learning that he had no right to influence the licensing decisions. For this reason, the discovery rule does not apply. Furthermore, VanVoorhies was, in fact, aware of the existence of the Patent Policy. For these reasons, VanVoorhies' fraud based tort claims are barred as untimely.[78] Accordingly, any claim by VanVoorhies, that his delayed knowledge of the subsequent licensing agreements resulted in his delayed discovery of a violation of that alleged promise, fails as a matter of law.

### 2. *Fraud.*

Even though the statute of limitations bars VanVoorhies' fraud claims, the Court nevertheless considers the merits of VanVoorhies' fraud claims.

■ The elements of fraud are: (1) that the act claimed to be fraudulent was the act of the defendant or induced by the defendant; (2) that it was material and false; (3) that the party relied upon it; and (4) that the party was damaged because he relied upon it.[79] The party alleg-

---

72. Doc. # 132, Exh. 3.

73. *Id.,* Exh. 4.

74. Doc. # 1.

75. *Id.*

76. *Id.,* Exh. B.

77. Doc. # 154A, Exh. 7.

78. *See Childers Oil Co., Inc. v. Exxon Corp.,* 960 F.2d 1265, 1272–73 (4th Cir.1992) ("[I]f

resolution of a statute of limitations defense presents a genuine question of material fact, a jury should resolve it. If not, a statute of limitations may be applied as a matter of law.").

79. See *Hervey v. Crouch,* 97 W.Va. 161, 124 S.E. 497, 498 (1924) ("The pleading must show: (1) That the act claimed to be fraudulent was the act of defendant or induced by him; (2) that it was material and false, that plaintiff relied upon it and was justified under the circumstances in relying upon it; and (3)

ing fraud must prove each element with clear and convincing evidence.[80]

■ VanVoorhies' arguments in support of his claim for fraud have undergone several permutations. Reduced to its essentials, VanVoorhies has three core arguments. All three arguments, however, are without merit because they do not establish the elements of fraud, or even if they could establish the elements of fraud, VanVoorhies has not established the proof of these elements with clear and convincing evidence.

First, the ICI [81] and IAS [82] licensing agreements do not constitute fraud as a matter of law. VanVoorhies alleges that these were secret, pre-existing agreements, at the time VanVoorhies assigned the licensing technology to WVU, to license the very same technology to Smith, ICI or IAS. Furthermore, VanVoorhies alleges that the failure to disclose the existence of such secret, pre-existing agreements constitutes fraud.

This argument is without merit. VanVoorhies has not established, with the requisite clear and convincing evidence standard,[83] the existence of any such agreement. On the contrary, VanVoo-

rhies has not presented any evidence establishing the existence of any such agreement. Additionally, VanVoorhies has not provided evidence of any promise not to license the technology to those parties. Importantly, the only evidence produced indicates that others were offered the initial licensing opportunities several years before Smith entered into the agreement with WVURC. Therefore, this argument fails because VanVoorhies has not established this claim of fraud with the requisite clear and convincing evidence standard.

Second, VanVoorhies has also presented no evidence that he was promised control over the licensing of the antenna technology. VanVoorhies' assertion that he was told he would have an "influence," regarding selection of the antenna technology licensee, does not constitute a promise of control and cannot, in any event, constitute fraud. VanVoorhies cannot establish the required fraud elements of materiality and reliance as to this allegation. Any such representation as to VanVoorhies' influence would, at most, constitute a representation about the future, and, therefore could not be fraud.[84]

---

that he was damaged because he relied upon it.") (citing *Houston v. McNeer*, 40 W.Va. 365, 22 S.E. 80 (1895)).

80. *See Bowling v. Ansted Chrysler–Plymouth–Dodge Inc.*, 188 W.Va. 468, 425 S.E.2d 144, 148 (1992) ("These elements [of fraud] must be proved by clear and convincing evidence.").

81. Doc. # 158, Exh. C.

82. *Id.*, Exh. E.

83. *See supra* note 80.

84. [T]he representation required, in order that there be actionable fraud, must ordinarily relate to a past or existing fact, or to an alleged past or existing fact, and not to future occurrences. So the general rule, which is subject to qualifications later appearing, is that fraud cannot be predicated on statements which are promissory in their nature, or constitute expressions of intention, and an actionable representation cannot consist of mere broken promises, unfulfilled predictions or expectations, or erroneous conjectures as to future events, even if there is no excuse for failure to keep the promise, and even though a party acted in reliance on such promise; nor, ... is the mere nonperformance of a promise evidence establishing fraud or lack of intent to perform. Predictions as to future events are ordinarily regarded as nonactionable expressions of opinion on which there is no right to rely, and obviously cannot constitute fraud where made in the honest belief that they will prove correct.
*Janssen v. Carolina Lumber Co.*, 137 W.Va. 561, 73 S.E.2d 12, 17 (1952).
Furthermore, there is no claim of any superior knowledge of events on behalf of the plaintiff. *See Miller v. Premier Corp.*, 608 F.2d 973, 981 (4th Cir.1979) ("There are, however, exceptions to this general rule, and one has application to the evidence in this case. A false prediction concerning future events made by one with superior knowledge of those events may constitute a fraudulent misrepresentation.").

Additionally, VanVoorhies could not reasonably have relied on the alleged representation of future influence over the licensing of the antenna technology. VanVoorhies repeatedly stated that he executed the assignment, of his rights in the antenna technology, with the understanding that, in exchange for that assignment, he would enjoy the benefits of the Patent Policy.[85] The Patent Policy does not contain any limitation on WVU's right to sublicense the technology.[86] VanVoorhies was aware of the Patent Policy by June 3, 1991, a year and a half before he executed the assignment on February 5, 1993.[87] Because the Patent Policy contains no restriction, on WVU's ability "to assign rights to future inventions to private corporations or businesses",[88] it would be unreasonable for VanVoorhies to rely on an alleged promise contrary to it.[89]

Further, failure to carry out the alleged promise, of influence over the licensing of the antenna technology, was neither material nor a cause of any harm to VanVoorhies. VanVoorhies alleged that he was promised an influence, not control, regarding the choice of licensee. At no time, in accord with VanVoorhies' own allegations, did VanVoorhies have the power to exclude Smith, ICI or IAS as potential licensees. Thus, any right, of influence over the licensing of the antenna technology, was immaterial. Therefore, VanVoorhies cannot establish a claim of fraud.

Last, Smith's alleged false statements, in a petition and declaration to the Patent Office in connection with Application '340, do not constitute fraud as a matter of law. Even if VanVoorhies could establish the falsity of these statements, Smith never made these statements to VanVoorhies. Additionally, VanVoorhies never relied upon these statements. Consequently, VanVoorhies cannot establish the reliance element of fraud.[90]

Accordingly, the Court finds, as a matter of law, that the defendant has not presented clear and convincing evidence to substantiate his claims of fraud, fraudulent concealment, and misrepresentation. Therefore, summary judgment will be granted in favor of the plaintiff and third-party defendants as to the First Claim of the Amended Counterclaim[91] and Third-Party Complaint.[92]

---

**85.** Doc. # 154A, Exh. 7.

**86.** The Patent Policy provides, in pertinent part, that "[o]rdinarily the University will not agree to assign rights to future inventions to private corporations or businesses, but the University at its own discretion may determine to do so." Doc. # 1, Exh. B.

**87.** Doc. # 154, Exh. 5.

**88.** Doc. # 1, Exh. B.

**89.** See e.g. Syx v. Midfield Volkswagen, Inc., 518 So.2d 94 (Ala.1987) (holding as a matter of law that any reliance on statements known ·to be untrue is unreasonable).

**90.** VanVoorhies' brief opposing summary judgment does not contend the numerous other alleged false statements by Smith, which VanVoorhies identified in a response to discovery request, are fraudulent. Thus, the arguments in Smith's briefs, regarding these statements, are uncontradicted and uncontested. Therefore, any claim by VanVoorhies based upon them is precluded.

Although the failure of a party to respond to a summary judgment motion may leave un-·controverted those facts established by the motion, the moving party must still show that the uncontroverted facts entitle the party to "a judgment as a matter of law." The failure to respond to the motion does not automatically accomplish this. Thus, the court, in considering a motion for summary judgment, must review the motion, even if unopposed, and determine from what it has before it whether the moving party is entitled to summary judgment as a matter of law. This duty of the court is restated in section (e) of the rule, providing, "if the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party." (citing Fed. R. Civ.P. 56(e)).
Custer v. Pan American Life Ins. Co., 12 F.3d 410, 416 (4th Cir.1993).

**91.** Doc. # 34.

**92.** Doc. # 32.

## B. Defendant's Fifteenth Claim: Declaration of Invalidity of Assignment Under the Patent Act.

For his Fifteenth Claim, VanVoorhies relies upon the underlying allegations that supported his common law fraud claim. VanVoorhies further asserts that his and Smith's subsequent assignment of Application '970/Patent '369 is void according to 35 U.S.C. § 261.[93] VanVoorhies bases this assertion upon the allegation that Patent '369 is invalid because it was obtained on the false oath by one not the inventor, namely Smith.

The doctrine of estoppel applies to the assignment of patents. This doctrine provides that "an assignor should not be permitted to sell something and later assert that what was sold is worthless, all to the detriment of the assignee."[94] The assignor's representation, whether explicit or implicit, that the patent rights the assignor is assigning are not worthless sets the assignor "apart from the rest of the world and can deprive [the assignor] of the ability to challenge later the validity of the patent."[95] Importantly, assignor estoppel bars a challenge to the validity of the initial invention and also a continuation-in-part application of a patent issuing therefrom.[96]

VanVoorhies only seeks to have the assignment of Patent '369 declared invalid. Inasmuch as VanVoorhies relies upon the same allegations for assignment invalidity as he did his state common law claims of fraud, the Court will refer to the analysis set forth above.[97] Given the same burden of producing clear and convincing evidence,[98] the Court concludes that VanVoorhies has not produced evidence sufficient to support his allegations of fraudulent assignment of Patent '369. The facts produced show that VanVoorhies executed the assignment pursuant to the WVU Patent Policy,[99] just as VanVoorhies did with Patent '737, for which he does not seek to invalidate.

## C. Defendant's Fourteenth Claim: Declaration of Patent Invalidity Under The Patent Act.

For his Fourteenth Claim, the defendant claims that Patent '369 is invalid. In support of his claim, defendant cites as authority, "the terms of the Patent Act, Title 35 of the United States Code, the Rules of Practice in Patent Cases, 37 C.F.R. §§ 1.1—1.809, and the Manual of Patent Examining Procedure" and "35 U.S.C. § 261, as obtained under false oath by one not the inventor, namely, Third–Party Defendant Smith."[100]

In the Order entered, pursuant to the hearing held on January 5, 2000,[101] the Court announced its intention to deny the plaintiff's motion for summary judgment on the defendant's Fourteen Claim. The Court stated that it was relying upon the decision of *The University of Colorado Found., et al. v. American Cyanamid Co.*[102] In that case, the Federal Circuit held

---

**93.** 35 U.S.C. § 261 (1984) ("Applications for patent, patents, or any interest therein, shall be assignable in law by an instrument in writing.").

**94.** *Diamond Scientific Co. v. Ambico, Inc.*, 848 F.2d 1220, 1224 (Fed.Cir.1988); *see also Mentor Graphics Corp. v. Quickturn Design Sys. Inc.*, 150 F.3d 1374, 1377 (Fed.Cir.1998) ("Assignor estoppel prevents a party who assigns a patent to another from later challenging the validity of the assigned patent.").

**95.** *Diamond Scientific Co.*, 848 F.2d at 1224.

**96.** *See Q.G. Prods., Inc. v. Shorty, Inc.*, 992 F.2d 1211, 1215 (Fed.Cir.1993) (stating that assignor-estoppel applies to continuation in parts to the patent assigned).

**97.** *See supra* notes 66–92 and accompanying text.

**98.** *See supra* note 80.

**99.** Doc. # 1, Exh. B.

**100.** Doc. # 34.

**101.** Doc. # 272.

**102.** 196 F.3d 1366 (Fed.Cir.1999).

Section 256 allows deletion of a misjoined inventor whether that error occurred by deception or by innocent mistake. As well, the section allows addition of an unnamed actual inventor, but this error of nonjoinder cannot betray any deceptive intent by that inventor. In other words, the statute allows correction in all misjoinder cases featuring an error and in those nonjoinder cases where the unnamed inventor is free of deceptive intent.[103]

■ The Federal Circuit further cited *Pannu v. Iolab Corp.,*[104] and held that "[Section 256] is a savings provision. If a patentee demonstrates that inventorship can be corrected as provided for in section 256, a district court must order correction of the patent, thus saving it from being rendered invalid."[105]

The Court announced its intention to grant summary judgment against the defendant's Fifteenth Claim.[106] Based upon the Court's announced intention, counsel for the plaintiff filed a motion to dismiss asserting that the Court lacks subject matter jurisdiction as to the Fourteenth Claim.[107] Plaintiff relied upon the decision of *Kucharcyzk v. Regents of the University of California.*[108]

*Kucharcyzk* involved facts similar to the case before the Court. In *Kucharcyzk,* the court reached the conclusion that two university professors lacked standing to seek the correction of inventorship.[109] The professors sued the University and licensee on the theory that the professors had

been denied their rightful share of the financial rewards of a magnetic resonance imaging technique.[110]

The court found that the plaintiffs' lacked standing to assert the claim, holding that "[t]he only reasonable interpretation of the assignment agreement is that plaintiffs relinquished their right to sue to correct inventorship—along with all other rights pertaining to the patent—when they executed the contract."[111]

The court explicitly rejected plaintiffs' position that they retained standing in order to prevent the patent from erroneously listing a co-inventor. The court held that, "in light of plaintiffs' lack of standing under section 256, the Court does not have jurisdiction as a matter of law to determine inventorship pursuant to that provision. Accordingly, plaintiffs' first cause of action must be dismissed for lack of jurisdiction."[112]

As a result of this motion[113] and the Court's announced intention to grant summary judgment in favor of defendant's Fourteenth Claim, invalidity of the patent assignment,[114] counsel for the defendant entered into an agreed Order wherein the defendant consented to summary judgment as to the Fourteenth Claim.[115]

**D. Plaintiff's Counts I and IV: Breach of Duty under Contract and Common Law, to Assign to the University, Inventions and Related Patent Property.[116]**

■ Plaintiff argues that it is the right-

---

103. *University of Colorado Found.,* 196 F.3d at 1374 (quoting *Stark v. Advanced Magnetics, Inc.,* 119 F.3d 1551, 1555 (Fed.Cir.1997)).

104. 155 F.3d 1344 (Fed.Cir.1998).

105. *University of Colorado Found.,* 196 F.3d at 1374–75 (quoting *Pannu,* 155 F.3d at 1350 (Fed.Cir.1998)).

106. Doc. # 284.

107. Doc. # 288.

108. 48 F.Supp.2d 964 (N.D.Cal.1999).

109. *Id.* at 973–74.

110. *Id.* 966.

111. *Id.* at 973–74.

112. *Id.* at 975.

113. Doc. # 284.

114. Doc. # 293.

115. Doc. # 294.

116. Defendant does not oppose plaintiff's motion for summary judgment as to Counts I and IV. However, this, by itself, is not grounds for the Court to grant summary judg-

ful owner of all technologies underlying Applications '340, '610 and '609. As indicated in the statement of material facts, plaintiff filed Application '340 was as a CIP to Application '970 when VanVoorhies did not assist in the preparation and filing of Application '340. Additionally, VanVoorhies filed Application '610, one day before the issuance of the '369 Patent from Application '970, for the purpose of interfering with Application '970. Finally, on the same day VanVoorhies filed Application '610, VanVoorhies also filed Application '609, which is directed toward the invention disclosed and claimed in Application '340.

In support of its argument, plaintiff argues that VanVoorhies' assignment of Application '970 included any CIP applications to the University. Furthermore, plaintiff argues that the technology underlying Application '340 is a CIP to Application '970 and Patent '369 issued from Application '970. For this reason, plaintiff concludes Application '340 is, therefore, subject to the assignment of Application '970. Therefore, plaintiff concludes that VanVoorhies is in breach of the agreement to assign any CIP's to Application '970.

Similarly, plaintiff argues that Application '610 was filed as an interference with Application '970, and Patent '369 issued from Application '970. For this reason, plaintiff argues that Application '610, therefore, covers the same invention as Application '970, and Patent '369 issued from Application '970. Therefore, plaintiff concludes that because it is the owner of Application '970, and Patent '369 issued from Application '970, it is, therefore, the owner of the technology underlying Application '610.

The Court finds plaintiff's arguments persuasive. The assignment is a valid contract: it is the manifestation of an offer and acceptance and is supported by consideration.[117] The assignment expressly provides that the assignment of Application '970 includes any CIP's of Application '970.[118] Therefore, because Application '340 is a CIP of Application '970, Application '340 is subject to the assignment of Application '970 to plaintiff. Accordingly, the Court finds that summary judgment is appropriate on this issue.

Additionally, Application '610 covers the same invention claimed in Application '970, and Patent '369 issued therefrom. VanVoorhies' assignment of Application '970 therefore includes the technology underlying Application '610.[119] Accordingly, the Court finds summary judgment appropriate on this issue.

For the same reason, the Court finds that plaintiff is the rightful owner of Application '609. Application '609 included the technology underlying Application '340, the CIP to Application '970. Therefore, VanVoorhies' assignment of Application '970 included the technology underlying Application '609.[120]

## IV. CONCLUSION.

Therefore, for the above-mentioned reasons, the Court is of the Opinion and **ORDERS** that:

---

ment in favor of plaintiff. The Court must still determine whether the plaintiff is entitled to judgment as a matter of law. *See Custer v. Pan American Life Ins. Co.*, 12 F.3d 410, 416 (4th Cir.1993) ("[T]he court, in considering a motion for summary judgment must review the motion, *even if unopposed,* and determine from what it has before it whether the moving party is entitled to summary judgment as a matter of law.") (emphasis added).

**117.** *See First Nat'l Bank of Gallipolis v. Marietta Mfg. Co.*, 151 W.Va. 636, 153 S.E.2d 172 (1967).

**118.** Doc. # 132, Exh. 4 (stating that the assignment of Application '970 includes "continuation[s]-in-part ... which may be filed upon said invention or inventions").

**119.** Doc. # 1, Exh. C (stating that the scope of the assignment of Application '970 extends to "any form or embodiment" of the technology underlying Application '970).

**120.** *Id.*

1. On defendant's First Claim (Fraud, Fraudulent Concealment, Misrepresentation) summary judgment is **GRANTED** in favor of WVU, WVURC, Smith and ICI;

2. On defendant's Fifteenth Claim (Declaration of Invalidity of Assignment Under the Patent Act) summary judgment is **GRANTED** in favor of WVU and WVURC;

3. On defendant's Fourteenth Claim (Declaration of Patent Invalidity Under the Patent Act) the Court confirms the defendant's consent to summary judgment and, accordingly, summary judgment is **GRANTED** in favor of WVU, WVURC, Smith and ICI.

4. On Plaintiff's Counts I and IV (Breach of duty Under Contract and Common Law, to Assign to the University, Inventions and Related Patent Property), summary judgment is **GRANTED** in favor of WVU.

The Clerk is directed to transmit a true of copy of this Order to counsel of record herein.